# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAWN METZGER, | : | No. 09cv1217 |
|     Plaintiff | : | |
|     v. | : | (Judge Munley) |
| PIKE COUNTY, | : | |
|     Defendant | : | |

## MEMORANDUM

Before the court for disposition is Defendant Pike County's motion for summary judgment on Plaintiff Dawn Metzger's complaint. The motion has been fully briefed and is ripe for disposition.

## BACKGROUND

Plaintiff Dawn Metzger ("Metzger") worked for Pike County as the Director of Pike County Children and Youth Services ("CYS") as an at-will employee. (Def.'s Statement of Undisputed Material Facts ("SUMF") ¶¶ 1-3 (Doc. 23)). CYS is a county agency charged with administering the Pennsylvania Child Protective Services laws. (SUMF ¶ 6).

Defendant Pike County ("Pike County" or "the County") is governed by a Board of Commissioners which at the relevant time period included Commissioners Harry Forbes ("Forbes"), Richard Caridi ("Caridi"), and Karl Wagner. (SUMF ¶ 4). The Board of Commissioners is charged with oversight of CYS and is responsible for hiring and supervising CYS employees. (SUMF ¶ 8).

One of the children under CYS's care was an eight-year-old boy named A.W. A.W. lived with his foster parents, Arthur and Lisa Moriarty. (SUMF ¶ 12). Attorney Stephen Guccini was the court-appointed Guardian *ad litem* for A.W. (SUMF ¶ 10). In January of 2009, CYS Supervisor Stacey DeGroat ("DeGroat") brought A.W.'s case to Metzger's attention. (Metzger Dep. 44 (Doc. 30-1)). According to Metzger, in the second week of January, A.W. had twice punched an aide in the face, attacked a school

principal, acted in a sexually explicit manner in a classroom, and ran from the school. (Id. at 46).

On January 14, 2009 (SUMF ¶ 17), Metzger decided that A.W. needed to be evaluated at the Meadows Psychiatric Hospital ("the Meadows") located in Centre Hall, Pennsylvania. (SUMF ¶ 13). Metzger had consulted with Assistant Director Tammy McCullough ("McCullough") and Placement Supervisor Kathy McCloskey ("McCloskey") and received medical assistance payment approval from Community Care Behavioral Health prior to the transfer. (Pl.'s Counterstatment of Material Facts ("CMF") ¶ 13 (Doc. 31); Metzger Dep. at 48-49).

The Meadows facility is 190 miles from where A.W. lived with his foster parents and the drive takes three and one-half hours. (SUMF ¶ 14). According to the County, the evaluation would have required an overnight stay, but Metzger indicates this is not necessarily so. (SUMF ¶ 15; CMF ¶ 15). According to Metzger, a psychiatric evaluation is equivalent to a medical evaluation, and she considered it to be a hospital visit, not a transfer. (Metzger Dep. at 51-52).

The record is clear that Metzger did not obtain permission from Guccini or notify him of A.W.'s transportation for evaluation until A.W. was already on the way. (SUMF ¶¶ 16, 17). Metger disputes, however, whether notice to a guardian *ad litem* was required since CYS was the legal custodian of A.W. and the evaluation was an emergency. (CMF ¶¶ 16, 17). Metzger also indicates that she tried to call Guccini as a courtesy prior to A.W. being transported, but Guccini was not available to take his call because he was in a trial. (Metzger Dep. at 55). Metzger only provided one hour's notice to A.W.'s foster parents before CYS employees arrived to transport A.W. (SUMF ¶ 20). Metzger indicates that McCloskey was responsible for notifying the foster parents. (CMF ¶ 20). The foster

2

parents were called sometime between 4:10 p.m. and 5:00 p.m. and informed of the evaluation scheduled for that night. (SUMF ¶¶ 20, 45). CYS employees did pick up A.W. from his foster parents. (SUMF ¶ 21). According to Social Worker Terry Sears, A.W. tried to shut the door on the CYS employees but acceded to his foster parents' advice to agree to be transported for an evaluation. (SUMF ¶ 22).

Guccini only learned of the transfer when A.W. was already on the way to the Meadows and believed that more notice should have been given and that court approval was required for such an evaluation. (SUMF ¶¶ 17, 18). Guccini believed that since an overnight stay would have been required for the evaluation, court approval should have been obtained regardless of whether CYS thought it was an emergency. (SUMF ¶¶ 18, 31). It is undisputed that Metzger did not obtain court approval for the transfer, but Metzger believed that such approval was not necessary. (SUMF ¶ 30; CMF ¶ 30). Metzger did not obtain approval from either A.W.'s foster parents or natural parents before transferring him, but Metzger disputes whether such approval is required. (SUMF ¶¶ 32, 35; CMF ¶ 33). According to Ed Coleman, DPW regulations require that natural parents be notified when a child's location is changed, but Metzger denies this interpretation. (SUMF ¶ 33; CMF ¶ 33). CYS has a policy requiring natural parents be notified if a child requires non-routine medical care, such as surgery or an overnight hospital stay unless there is a Termination of Parental Rights. (SUMF ¶ 34). Guccini did not believe that A.W.'s parental rights had been terminated. (SUMF ¶ 36). Metzger did not believe the evaluation was non-routine medical care and notes that the policy does not indicate when parents must be notified. (CMF ¶ 34).

While A.W. was en route to the Meadows, Commissioner Forbes called Metzger regarding the transfer after Forbes had been contacted by

3

A.W.'s school principal. (SUMF ¶ 23). Metzger infers that Forbes was otherwise pressured politically. (CMF ¶ 23). Forbes also spoke with CYS Solicitor Oressa Campbell ("Campbell") and Commissioner Caridi. (SUMF ¶ 24). Forbes and Caridi agreed that the transfer process needed to be stopped so that all the parties involved could review the circumstances. (SUMF ¶ 26). Forbes then directed Metzger to have the CYS employees return A.W. to his foster home. (SUMF ¶ 27). Metzger objected to Forbes's involvement in the matter but complied with his direction. (Metzger Dep. at 68-69). Metzger believes that Forbes's decision was based not on a desire to review the circumstances of A.W.'s transportation, but instead was based upon political pressure. (CMF ¶ 26).

The following morning, at 9:00 a.m., Metzger called Regional Director of the DPW's Office of Children and Youth and Families, Ed Coleman ("Coleman") and Assistant Regional Director Jaqueline Maddon ("Maddon"). (SUMF ¶¶ 74, 76, 77; Metzger Dep. at 73-75). Coleman recalls that Metzger was looking for advice on the A.W. situation because she felt A.W. needed a diagnostic and evaluation and that Forbes had wrongfully intervened. (SUMF ¶ 77). Coleman and Metzger discussed the original order which placed A.W. into CYS custody because the specificity of that order would impact what actions CYS could take without orders of the court. (Coleman Dep. (Doc. 23-1 at 48-49)). They also discussed whether Forbes's direction to Metzger to have A.W. cancel the transportation was his own action or on behalf of the board. (Id. at 49). Coleman's ultimate advice to Metzger was that the decision to transport A.W. for an evaluation would not be up to CYS or a commissioner, but the court. (Id.)

Metzger characterizes the conversation as a complaint and a "good faith report" to the DPW regarding the Commissioners' intervention in the

4

transfer. (CMF ¶ 77). Metzger believed that it was wrongful for Forbes to have interfered with the decision to transfer A.W. and told this to Coleman and Maddon. (CMF ¶ 28). According to Metzger, Coleman and Maddon could not understand Commissioner Forbes's involvement given that the child was in CYS's legal care and custody and that the evaluation would be paid for by medical assistance and not by the County, but they indicated that the only way to circumvent the commissioners' directive was by court order. (Metzger Dep. at 76). According to Maddon, the County Commissioners were Metzger's bosses with authority to give Metzger instructions. (SUMF ¶ 28).

Following that call, Metzger informed McCollough that Metzger had called the DPW and that according to Coleman and Maddon a court order was needed. (Metzger Dep. at 83). Metzger had McCollough call Solicitor Campbell to get the order and McCollough informed Campbell that Metzger had contacted the DPW. (Id.) Thus, Campbell was aware of Metzger's call to the DPW.

Solicitor Campbell then spoke with the Commissioners. (Metzger Dep. at 83-84). The commissioners, after consulting with Pike County attorneys and CYS attorneys, voted to suspend Metzger on January 15, 2009, pending an investigation. (SUMF ¶ 42). Metzger met with the Commissioners at 11:30 a.m. and was informed that she had been suspended. (Metzger Dep. at 85). After her suspension, Metzger complained to Deputy Secretary for the DPW Richard Gold ("Gold") regarding the commissioners' involvement. (Metzger Dep. at 81-82). CYS Fiscal Officer Jackie Green testified that Coleman had told her that the DPW would be conducting an investigation into why Metzger had been terminated. (Green Dep. at 33-34 (Doc. 30-5)). Metzger's deposition is equivocal as to whether the DPW made any investigation into her

5

complaint, but Maddon's deposition indicates some kind of visit was made. (Metzger Dep. at 79; Maddon Dep. (Doc. 23-1 at 52)).

Metzger indicates that "upon information and belief, the Commissioner's [sic] learned of Plaintiff's complaint to DPW before they suspended her without pay and before they demoted and/or terminated Plaintiff's employment." (CMF ¶ 78). It is clear from her deposition that Metzger does not, in fact, know whether Forbes or any other commisioner knew of her complaint to Coleman and Maddon. (Metzger Dep. at 83-87). Coleman indicates that Pike County Chief Clerk Gary Orben ("Orben") called to inform him that Metzger had been suspended, but that he did not tell Orben that Metzger had complained to him. (SUMF ¶ 79). Forbes indicates that he never knew that Metzger complained to anyone at the DPW. (SUMF ¶ 81).

On January 15, 2009, Margaret M. Schaeffer ("Schaeffer"), the principal of Shohola Elementary School which A.W. attended, wrote to Commissioner Forbes. (SUMF ¶ 43; Schaeffer Letter of Jan. 15, 2009 (Doc. 23-1 at 2)). In the letter, Schaeffer acknowledges that she has requested that A.W. be picked up from school for dangerous behavior and referred A.W. to "Frienship House" and that her prior requests might have prompted Metzger's decision to transfer A.W. to the Meadows for an evaluation. (SUMF ¶ 44). Schaeffer also states, however, that she believed CYS was not acting in A.W.'s best interest based on the lack of notice given to A.W. and his foster parents before the evaluation. (SUMF ¶¶ 44, 45).

After suspending Metzger, the Commissioners solicited reports on Metzger from Pike County President Judge Joseph Kameen ("Judge Kameen"), Pike County CYS Solicitor Oressa Campbell ("Campbell"), and Pike County Court Administrator Samantha Venditti ("Venditti"). (SUMF ¶

6

46). On January 22, 2009, Judge Kameen provided a memo expressing dissatisfaction with Metzger and indicating that Metzger's behavior caused him a certain amount of distrust towards CYS. (SUMF ¶¶ 47, 51; J. Kameen Memo of Jan. 22, 2009 (Doc. 23-1 at 19)). Judge Kameen indicated that Metzger disregarded orders of his court and that had Metzger been a private party she might have been held in contempt. (SUMF ¶¶ 48, 49).

On January 23, 2009, Venditti wrote a memo criticizing Metzger's disrespectful performance as CYS Director. (SUMF ¶ 52; Venditti Memo of Jan. 23, 2009 (Doc. 23-1 at 16)). In particular, Venditti complained that Metzger did not perform a home study and instructed CYS employees to ignore a court order. (SUMF ¶¶ 53, 54). Venditti also reported that Metzger disregarded court procedures by presenting herself to Judges' Chambers without permission. (SUMF ¶ 56). Venditti indicates that Metzger's professionalism had concerned the court for an extended period of time for various reasons, including contacting the court ex parte to seek modification of an order to procure funding. (SUMF ¶ 57). Finally, Venditti echoed Judge Kameen's intimation that Metzger's behavior destroyed the relationship of trust previously enjoyed between CYS and the court. (SUMF ¶ 58).

On January 26, 2009, Campbell wrote a memo to the Commissioners indicating that Metzger's decisions violated state laws and regulations as well as CYS policies. (SUMF ¶¶ 59, 60; Campbell Memo of Jan. 26, 2009 (Doc. 23-1 at 21)). According to Campbell, Metzger instructed her staff not to conduct a visitation that had been ordered by Judge Kameen. (SUMF ¶ 61). Metzger also allegedly instructed her staff not to perform a home study which had been ordered by the county court. (SUMF ¶ 62). Finally, Campbell complains that Metzger unilaterally decided to transfer A.W. for

7

an evaluation in contravention of CYS policy that guardians *ad litem* and other professionals be involved in such decisions. (SUMF ¶¶ 19, 63).

According to Commissioner Wagner, two suspension hearings were scheduled regarding Metzger's suspension, but they were not conducted because the County offered Metzger employment at the correctional facility. (SUMF ¶ 67). Pike County Solicitor Tom Farley wrote a letter on February 13, 2009 purporting to confirm a settlement reached the previous day by which Metzger accepted the offered employment as a Treatment Counselor at the correctional facility to begin February 23, 2009. (SUMF ¶ 68; Farley Letter of Feb. 13, 2009 (Doc. 23-1 at 14)). Metzger denies agreeing at the February 12, 2009 meeting to take the job at the correctional facility. (CMF ¶ 68; Metzger Dep. at 98).

Metzger did not begin work at the correctional facility on February 23, 2009. (SUMF ¶ 69). In a letter dated February 23, 2009, Metzger informed Orben that she would "not be starting at the Jail today[]" and asking to be reappointed to the position of Director of CYS. (SUMF ¶ 71).

On February 25, 2009, the Commissioners voted at a public meeting to terminate Metzger's employment as Treatment Counselor at the Pike County Correctional Facility, effective that same day. (SUMF ¶ 72). Metzger disputes whether she ever took the prison job. (CMF ¶ 72). The Commissioners also voted to promote Tammy McCullough to Director of CYS, effective March 2, 2009. (SUMF ¶ 73). Metzger indicates that prior to January 15, 2009, she had consistently received merit pay increases and had never been disciplined. (CMF ¶¶ 84, 85).

On June 26, 2009, Metzger filed her complaint in this court. (Compl. (Doc. 1)). Metzger's complaint raises a claim under 42 U.S.C. § 1983 for violation of her right to free speech under the First Amendment (Count I); a claim for violation of Article I, Section 7 of the Pennsylvania Constitution

based on freedom of speech (Count II); and a claim under the Pennsylvania Whistlewblower Law, 43 PA. STAT. § 1421 *et seq.* (Count III). (Compl.). The County answered the complaint on October 15, 2009. (Answer (Doc. 7)). On November 20, 2010, the County filed the instant motion for summary judgment, bringing the case to its present posture. (Doc. 22).

**JURISDICTION**

The court has federal question jurisdiction over this civil rights action brought under 42 U.S.C. § 1983. See 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."); 28 U.S.C. §§ 1343(a)(3), (4) (granting district courts jurisdiction over civil actions brought to redress deprivations of constitutional or statutory rights by way of damages or equitable relief). The court has supplemental jurisdiction over plaintiff's state-law claim pursuant to 28 U.S.C. § 1367(a). ("In any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article II of the United States Constitution.").

**LEGAL STANDARD**

Before the court is the defendant's motion for summary judgment. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. <u>Int'l Raw Materials, Ltd. v. Stauffer Chem. Co.</u>, 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the suit under the governing law. <u>Id.</u> Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. <u>Celotex v. Catrett</u>, 477 U.S. 317, 322 (1986). Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. <u>Id.</u> at 324.

**DISCUSSION**

Metzger has brought suit pursuant to section 1983. Section 1983 does not, by its own terms, create substantive rights. Rather, it provides remedies for deprivations of rights established elsewhere in the Constitution or federal law. <u>United States v. Kneipp</u>, 95 F.3d 1199, 1204 (3d Cir. 1996). In pertinent part, section 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia,

> subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Thus, to establish a claim under section 1983, two criteria must be met. First, the conduct complained of must have been committed by a person acting under color of state law. Second, the conduct must deprive the plaintiff of rights secured under the Constitution or federal law. Sameric Corp. of Delaware, Inc. v. City of Philadelphia, 142 F.3d 582, 590 (3d Cir. 1998). There is no dispute that Pike County constitutes a state actor, thus we only examine whether Metzger's First Amendment rights were violated by the County's actions.

Because Metzger was a government employee, her claim of retaliation for engaging in activity protected under the First Amendment is subjected to the three-step test laid out in Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005). First, the employee must show that her activity was protected. Id. (citing Pickering v. Bd. of Educ., 391 U.S. 563 (1968)); Green v. Phila. Hous. Auth., 105 F.3d 882, 885 (3d Cir. 1997). Second, the employee must show that the protected activity "'was a substantial factor in the alleged retaliatory action.'" Hill, 411 F.3d at 125 (quoting Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 391 U.S. 563 (1968)); Pro v. Donatucci, 81 F.3d 1283, 1288 (3d Cir. 1996). "Third, the employer may defeat the employee's claim by demonstrating that the same adverse action would have taken place in the absence of the protected conduct." Hill, 411 F.3d at 125. See also Baldassare v. New Jersey, 250 F.3d 188, 194 (3d Cir. 2001).

> A public employee's statement is protected activity when (1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not

11

> have "an adequate justification for treating the employee differently from any other member of the general public" as a result of the statement he made.

Hill v. Borough of Kutztown, 455 F.3d 225, 241-42 (3d Cir. 2006) (citing Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)). The issue of whether a public employee's expression is constitutionally protected is a question of law. Azzaro, 110 F.3d at 975.

Here, Metzger's First Amendment claim for retaliation fails because the record indicates that Metzger, in her conference call with Coleman and Maddon, was not speaking as a general citizen. There is no genuine issue of material fact but that Metzger, acting in her capacity as Director of CYS, called to complain about Forbes and determine the appropriate action Metzger should take as Director of CYS. Coleman did not interpret the complaint as Metzger reporting a violation of Pennsylvania law, but as a call for advice in determining who had authority and what course Metzger should take as director. Tellingly, Coleman and Maddon suggested that the solution to the impasse was a court ordered psychiatric evaluation for A.W.– not a court action against the Commissioners for violation of Pennsylvania laws or regulations. Because we find that Metzger was not speaking as a general citizen, but rather as Director of CYS, Pike County's motion for summary judgment will be granted on Metzger's section 1983 claim for violation of her First Amendment rights.

Having determined that summary judgment will be granted on Metzger's claim under section 1983, we decline to retain jurisdiction over Metzger's two pendant state law claims. See United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966). Thus, Metzger's claims under Article I, Section 7 of the Pennsylvania Constitution (Count II) and under the Pennsylvania Whistleblower Law, 43 PA. STAT. ANN. §§ 1421-28 (Count III), will be dismissed without prejudice to Metzger bringing such claims in

state court.

**CONCLUSION**

For the reasons stated above, Defendant Pike County's motion for summary judgment will be granted on Plaintiff Dawn Metzger's claim for First Amendment retaliation under section 1983. The court will dismiss the remaining state law claims without prejudice. An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAWN METZGER, Plaintiff | : | No. 09cv1217 |
| v. | : | (Judge Munley) |
| PIKE COUNTY, Defendant | : | |

## ORDER

**AND NOW**, to wit, this 28th day of February 2011, upon consideration of Defendant Pike County's motion for summary judgment (Doc. 22), it is HEREBY **ORDERED** that the motion is **GRANTED** with respect to Plaintiff Dawn Metzger's claim for First Amendment retaliation under section 1983 (Count I). Metzger's claims under Article I, Section 7 of the Pennsylvania Constitution (Count II) and under the Pennsylvania Whistleblower Law, 43 PA. STAT. ANN. §§ 1421-28 (Count III), are HEREBY **DISMISSED** without prejudice to Metzger bringing such claims in state court.

The Clerk of Court is directed to **CLOSE** this case.

**BY THE COURT:**

s/ James M. Munley
**JUDGE JAMES M. MUNLEY**
**United States District Court**